**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ANGELA WISE and GIDEON ROMM, on
behalf of themselves and all others similarly
situated,

                 Plaintiffs,

        v.

ENERGY PLUS HOLDINGS LLC,

                Defendant.

Civil Action No. 11-CV-07345 (WHP)

**BRIEF OF ENERGY PLUS HOLDINGS LLC IN RESPONSE**
**TO THE BRIEF *AMICUS CURIAE* OF THE ATTORNEYS GENERAL**

Dana B. Klinges
dklinges@duanemorris.com
Charles M. Hart (*pro hac vice*)
chart@duanemorris.com
DUANE MORRIS LLP
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1000
Facsimile: 212.692.1020

*Attorneys for Energy Plus Holdings LLC and*
*Energy Plus Natural Gas LLC*

# TABLE OF CONTENTS

**Page**

I.   Introduction ................................................................................................ 1

II.  Argument ...................................................................................................... 2

    A.   The Class Action Fairness Act Did Not Create Any "Unique Role" for *Amici.* ................................................................................................ 2

    B.   The Settlement Fairly Compensates Class Members and Should Be Approved .............................................................................................. 5

        1.   Energy Plus Has Strong Defenses to the Claims ........................ 6

        2.   Statutory Remedies of the Attorneys General Are Irrelevant Here .......... 11

        3.   Certification and Continued Class Treatment Are Uncertain. .................. 11

        4.   The Settlement is Reasonable in Light of the Class's Potential Damages ........ 13

        5.   The Settlement Amount is Reasonable in Light of Defendant's Resources. ........ 15

    C.   The Scope of the Release is Ordinary and Appropriate. ....................... 15

    D.   *Amici*'s Speculation About the Claims Process Should be Disregarded. ............. 17

    E.   The Injunctive Relief Provisions Adequately Address Class Members' Claims .......... 20

        1.   The Law Does Not Prohibit Introductory Rates ...................... 21

        2.   An Injunction Prohibiting Early Termination Fees is not Warranted. ...... 21

        3.   The Court Cannot Enjoin "deceptive business practices generally." ....... 22

        4.   The July 31, 2014 End Date for Injunctive Relief is Appropriate ........... 22

    F.   Attorneys' Fees Are Within the Discretion of the Court and Do Not Bar Approval. ........ 24

III. Conclusion .................................................................................................. 25

i

## **TABLE OF AUTHORITIES**

**Cases**

*In re Am. Int'l Group, Inc. Sec. Litig.*, 04 Civ. 8141 (DAB), 2013 U.S. Dist. LEXIS 3479 (S.D.N.Y. January 7, 2013) .......................................................................................... *passim*

*In re Am. Int'l Group, Inc. Sec. Litig.*, 04 Civ. 8141 (DAB), 2013 U.S. Dist. LEXIS 52624 (S.D.N.Y. April 11, 2013) ....................................................................................4

*In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226 (E.D. Pa. 2009) .......................................................................................................16

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ....................................................25

*Ault v. Walt Disney World Co.*, 692 F.3d 1212 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013) ...............................................................................................................4

*In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164 (S.D.N.Y. 2000) .............5

*Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 U.S. Dist. LEXIS 98763 (N.D. Ohio Sept. 1, 2011) .......................................................................................................5

*In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 09-2107, 2012 U.S. Dist. LEXIS 135313, 2012 WL 4322012 (E.D. Pa. Sept. 21, 2012) .......................................................3

*Charron v. Pinnacle Group NY LLC*, 874 F. Supp. 2d 179 (S.D.N.Y. 2012) ..........................5, 11

*Comcast Corp. v. Behrend*, __ U.S. __, 133 S. Ct. 1426 (2013) ....................................12

*Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) .................................................5-6, 15, 24

*Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010) ...........................................11

*Esslinger v. HSBC Bank Nev., N.A.*, Civ. A. No. 1-3213, 2012 U.S. Dist. LEXIS 165773 (E.D. Pa. Nov. 19, 2012) ................................................................................................4

*Evans v. Jeff D.*, 475 U.S. 717 (1986) ..............................................................................11

*Faistl v. Energy Plus Holdings LLC*, 12-cv-02879-JLL-MAH (D.N.J. September 4, 2012) ..........8

*Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292 (S.D. Fla. 2007) ....................................4

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24 (2d Cir. 1978) ..................24

*Larson v. Sprint Nextel Corp.*, No. 07-5325 (JLL), 2010 WL 234934 (D.N.J. Jan. 15, 2010) ..........................................................................................................................16

*Lemus v. H&R Block Enters. LLC*, No. C 09-3179 SI, 2012 U.S. Dist. LEXIS 119026 (N.D. Cal. Aug. 22, 2012) ................................................................18

*In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) ................................................................9

*Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985) ........................................................25

*Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ....................5, 11, 15

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ..........................................................13

*In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 .......................................................................................3, 4

*Pelt v. Utah*, 539 F.3d 1271 (10th Cir. 2008) ..............................................................17

*Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41 (2d Cir. 1996) .......................................22

*Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73 (D.D.C. 2011 ..................................4

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) ..............................18

*Swift & Co. v. United States*, 196 U.S. 375 (1905)(Holmes, J) ....................................22

*Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179 (D.D.C. 2011) ..............................18

*United States v. Microsoft*, 56 F.3d 1448 (D.C. Cir. 1995) ........................................23

*Wilson v. DirectBuy, Inc.*, Civ. A. No. 3:09-cv-590 (JCH), 2011 U.S. Dist. LEXIS 51874 (D. Conn. May 16, 2011) ...............................................................................4

**Statutes**

28 U.S.C. §1712 ........................................................................................................4

Class Action Fairness Act of 2005 ...................................................................2-4, 19

Tex. Bus. & Com. Code Ann. §§ 17.45(9), 17.50(b)(1) ..................................................14

**Other Authorities**

Fed. R. Civ. P. 23(b)(2) ..............................................................................................13

Fed. R. Civ. P. 23(b)(3) ..............................................................................................13

Fed. R. Civ. P. 23(e) ..................................................................................................11

Fed. R. Civ. P. 65 ................................................................................................22, 24

DM1\3953989.3

I.     **Introduction**

Without waiving their rights to oppose class treatment and reserving all of their defenses should the settlement be rejected and the case return to litigation, Energy Plus Holdings LLC and Energy Plus Natural Gas LLC (collectively "Energy Plus") submit this brief in response to the brief filed by the New York Attorney General ("NYAG") on behalf of his office and the Attorneys General of Connecticut, Illinois and Maryland (collectively "*Amici*") purporting to object to final approval of the class action settlement now before the Court.

Energy Plus, like other energy service companies ("ESCOs'), came into being as a result of deregulation of the retail energy supply markets in New York and other states.  ESCOs compete with each other to provide consumers a variety of energy products and services.  At Energy Plus, the business model centers on providing valuable extras, such as airline miles and merchant reward points to energy consumers, offered mostly through direct mail marketing in cooperation with partners sponsoring these programs.  Price is not the main feature of this marketing.  *Amici* cannot reasonably argue, after energy supply deregulation, that all ESCOs must provide energy at the same rates as the lowest-price offer or that there is anything deceptive in marketing energy services with the added benefits offered by Energy Plus.  Rather, *Amici* apparently believe that customers of Energy Plus are just not receiving enough compensation in this settlement.

Many of *Amici*'s arguments are directed to the representative plaintiffs and their counsel – for example, the contention that the extremely modest awards to named plaintiffs, of a type and size routinely approved by federal courts, somehow render the settlement unfair and the similar complaint about the attorneys' fee provision of the settlement.  These arguments are better addressed by class counsel.  *Amici*'s other arguments, however, call out for a response from

Energy Plus, especially those that impliedly suggest that Energy Plus lacked strong defenses to plaintiffs' claims.

As the NYAG notes, his office served a subpoena for documents on Energy Plus in August 2012. Energy Plus has cooperated in providing more than 175,000 documents to the NYAG in connection with his investigation. The Connecticut Attorney General has likewise received voluminous documents, and both New York and Connecticut have conducted several meetings and settlement negotiations with Energy Plus. In light of the broad access to documents and personnel afforded to the Connecticut and New York Attorneys General, it is nothing short of alarming to read the many misstatements of fact in *Amici*'s brief. For example, *Amici* misstate the settlement terms as they relate to the gift card option — although those are spelled out on the settlement administrator's public website —, have not investigated the viability of "bill credits" as an alternative to the claims process (they are not viable) and characterize the allegations in this case in a way that makes one question whether they have read the complaints. Where, as here, third parties do not seek to intervene and are without standing to object to a settlement (because they are not class members) their comments must be well-informed if they are to be useful — a standard these *Amici* do not meet.

## II.    Argument

### A.    The Class Action Fairness Act Did Not Create Any "Unique Role" for *Amici*.

*Amici* contend that the Class Action Fairness Act of 2005 ("CAFA") created a "unique role" for attorneys general in "addressing the fairness of class action settlements." *Am.* Br. at 3 (citing CAFA and its legislative history). Even if that were true — which it isn't — such a role is helpful to the Court and the class only if the attorneys general master the terms of the settlement before raising objections to it. The weight of case law, moreover, holds that CAFA created no such "unique" role, much less did it provide attorneys general with "veto power" over

2

negotiated class action settlements to which the federal courts have given preliminary approval. *See In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 09-2107, 2012 U.S. Dist. LEXIS 135313, 2012 WL 4322012, at *4 (E.D. Pa. Sept. 21, 2012) ("The statute says nothing . . . of granting states a right to be heard on, or formally appeal, every class action settlement simply because residents of that state are class members."); *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 Section J, 2012 U.S. Dist. LEXIS 181511 at *132-33 (E.D. La. December 21, 2012) ("[CAFA] simply requires notification; it does not create standing that a state official otherwise lacks." (citing *In re Budeprion*)). Perhaps because of this weight of authority, *Amici* do not purport to object, *per se* – nor do they ask to intervene – but only assume that they will be heard as "friends of the court."

CAFA's principal reform was to afford a federal forum to defendants facing putative class actions and to curtail "coupon settlements."  Recognizing the balance that our federalism demands, CAFA was drafted to contain a provision mandating notice to regulators or states' attorneys general when parties settle class action suits.  Then-Attorney General Elliot Spitzer was one of several attorneys general who opposed CAFA because the Act did *not* offer the attorneys general "clear authority . . . to more closely examine defendants on issues bearing on the fairness of the proposed settlement."  *See* Letter to Senators Frist and Reid (Feb. 7, 2005), *reprinted in* 151 Cong. Rec. H644-45 (daily ed. Feb. 16, 2005).  The Act passed without giving attorneys general the type of augmented oversight role that they lobbied for at the time and now mistakenly contend it contains.  Accordingly, a court in this district recently concluded that "CAFA's provisions create no new standing authority that would empower the NYAG to file its concerns to the Settlement as an Objector."  *In re Am. Int'l Group, Inc. Sec. Litig.*, 04 Civ. 8141

(DAB), 2013 U.S. Dist. LEXIS 3479, at *21 (S.D.N.Y. January 7, 2013) (approving settlement of class action over objection by the NYAG).

The cases that *Amici* rely upon for the proposition that attorneys general have special influence in class action settlement proceedings, *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1328 (S.D. Fla. 2007), and *Wilson v. DirectBuy, Inc.*, Civ. A. No. 3:09-cv-590 (JCH), 2011 U.S. Dist. LEXIS 51874 (D. Conn. May 16, 2011), are both cases involving "coupon settlements," over which CAFA requires heightened judicial scrutiny even without comment by attorneys general.  *See* 28 U.S.C. §1712.[1]  This is not a "coupon settlement."  Far from it, the class here is entitled to valuable financial compensation in one of several forms.  Such a settlement deserves to be approved over objections by attorneys general.  *See, e.g., Ault v. Walt Disney World Co.*, 692 F.3d 1212 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013) (23(b)(2) class settlement upheld despite objections of 23 attorneys general)*; Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 78 (D.D.C. 2011) (approving settlement where "[i]n an amicus brief, the Attorneys General of twenty-one states and the District of Columbia objected"); *In re Am. Int'l Group, Inc. Sec. Litig.*, 04 Civ. 8141 (DAB), 2013 U.S. Dist. LEXIS 52624 (S.D.N.Y. April 11, 2013)(approving settlement of class action over objection by the NYAG); *In re Oil Spill*, MDL No. 2179 Section J, 2013 U.S. Dist. LEXIS 4595 (E.D. La. January 11, 2103)(medical benefits class settlement approved over Louisiana Attorney General's objections); *Esslinger v. HSBC Bank Nev., N.A.*, Civ. A. No. 1-3213, 2012 U.S. Dist. LEXIS 165773 (E.D. Pa. Nov. 19, 2012) (nationwide class certified under 23(b)(3) for settlement purposes despite

---

[1]     Coupon settlements normally require a purchase from the defendants to get any benefit. Energy Plus notes that the *Wilson* case was transferred to the Northern District of Indiana, where, in a companion case, *Swift v. DirectBuy, Inc.*, a revised class action settlement that includes cash benefits is scheduled for a final approval hearing on September 10, 2013.  11-cv-00401-TLS-PRC (N.D. Ind.).

objection from attorneys general of Hawaii, Mississippi and West Virginia); *Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 U.S. Dist. LEXIS 98763 (N.D. Ohio Sept. 1, 2011) (settlement approved over objection of 38 attorneys general and the Federal Trade Commission).

> B.   The Settlement Fairly Compensates Class Members and Should Be Approved.

*Amici* never acknowledge the essential fact that this is *a settlement*, not an admission of liability.  "This, of course, is why it is called a settlement — it nets the Class Members something that is generally less than they could get if they litigated individually in court — assuming they win." *Charron v. Pinnacle Group NY LLC*, 874 F. Supp. 2d 179 (S.D.N.Y. 2012).  The compensation to the class in any settlement necessarily must be weighed against the risks that class members would not finally prevail.

Although *Amici* simply avoid discussion of the appropriate standard for approval of a settlement like this one, that standard is well settled.  First, a "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  Manual for Complex Litigation, Third, § 30.42 (1995) (cited in *Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)); *see also In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000).  *Amici* do not argue that this settlement was a product of collusion or that counsel was incompetent; thus, the presumption should apply.

District courts then examine the fairness, adequacy and reasonableness of a class settlement according to the nine "*Grinnell* factors."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (citing *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).  One of those factors is whether the monetary relief provided under a settlement is "adequate," which is evaluated "in light of the best possible recovery" to the class "in light of all the attendant risks of litigation." *Grinnell* at 463.  The best possible monetary recovery for the

class if there were *no risk whatsoever* is not the measure.  *See, e.g., Canupp v. Sheldon*, No. 2:04–cv–260, 2009 WL 4042928, at *10 (M.D. Fla. Nov. 23, 2009) ("court should not try the case nor should court order a proponent of a proposed settlement to justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes") (internal quotations and citation omitted)), *aff'd*, 447 Fed. Appx. 976 (11th Cir. Dec. 1, 2011). Rather, the fact that a proposed settlement amounts to less than the full *potential* recovery "does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell* at 455.  "[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n.2.  The recovery here is millions of dollars.

Moreover, the focus of *Grinnell* and its progeny is on the potential recovery *by the class*. Potential monetary recovery *by attorneys general* is simply not one of the *Grinnell* factors. Here, the *Grinnell* factors point towards final approval of this settlement as fair and adequate to the class.

1.    Energy Plus Has Strong Defenses to the Claims

*Amici* principally contend that the monetary relief provided to class members under the settlement agreement is inadequate because the class members have "strong" claims.  *Am.* Br. at 7-10.  Out of a class of more than 400,000, only two members objected.  Leaving aside for the moment the relative absence of objections from class members, *Amici* make no argument on the merits to support this contention.  They present not a scintilla of evidence that Energy Plus's marketing material was deceptive.  Instead, *Amici* simply assume liability, saying: "Plaintiffs allege, and *Amici* agree" that false advertising occurred.  *Am.* Br. at 5.  Energy Plus emphatically

does not agree.  Indeed, the primary reason that the settlement is fair is that proving liability is quite uncertain.

For example, *Amici* repeatedly assail what they derogatorily term "teaser" rates, but such introductory rates are commonplace in the industry and are perfectly legal.  In fact, both Connecticut and New York recognize that introductory rates are accepted and, indeed, New York's Public Service Commission's ESCO Enrollment Program promotes the use of introductory offers for a limited period of time to encourage customers to switch to ESCOs. Available at http://www.askpsc.com/askpsc/page/?PageAction=renderPageById& PageId=170e82c440a34abdc4eb7c02349bbdf8).[2]

With respect to Energy Plus, the introductory nature of the initial rates was fully disclosed in the marketing material and elaborated upon in the contract received by each class

[2]  As demonstrated by this website, ESCO Referral programs were actively encouraged by the Commission.  Particularly relevant is the following quote:  "The introductory discount creates a benefit that further encourages customers to explore retail access opportunities."  *Order Adopting ESCO Referral Program Guidelines and Approving an ESCO Referral Program Subject to Modifications* (12.22.05), at 28, available at http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7BF829EF3E-F80D-400C-ABAA-42912C3DAAAE%7D.

Energize Connecticut[sm] — an initiative of the Connecticut Energy Efficiency Fund, the Clean Energy Finance and Investment Authority, the State of Connecticut, and Connecticut electric and gas utilities maintains a website showing numerous introductory rates in plans advertised as, for example:  "Six month fixed price. Cancellation fee. Rolls over to variable rate without notice."  http://www.energizect.com/compare-energy-suppliers/compare-supplier-options.

New York's Public Service Commission maintains a website with offers such as this: "Variable rate offer. $.075 is guaranteed for the month of May only. The rate for the months following will reflect market conditions and may be higher or lower." http://www.newyorkpowertochoose.com/ptc_choose.cfm?CFID=670871&CFTOKEN=89079222.  Connecticut also maintains an on-line Electric Supplier Price Form, which defines a "Promotional Price" as:  "a price that is not available to current customers or is designed to increase customer enrollment with a supplier."  Available at http://www.ct.gov/pura/cwp/view.asp?a=3356&q=414004 (under link labeled Electric Supplier Price Filing Form).

7

member.  In a companion case, whose named plaintiffs have joined in and support this settlement, the United States District Court for the District of New Jersey ruled that the original complaint failed to state a claim under any of the theories pled, including New Jersey's Consumer Fraud Act.  *Faistl v. Energy Plus Holdings LLC*, 12-cv-02879-JLL-MAH, (D.N.J. September 4, 2012) (attached hereto as Exhibit A ).  The *Faistl* court not only pointed to clear disclosures but explicitly found that "[t]he terms of the parties' Agreement clearly provided for and explained the actions that Defendant(s) ultimately took — namely, the provision of gas and electric services at 'variable' monthly rates.  The Agreement contained no guarantee that the monthly rate would, in fact, result in any percentage of savings over the local utility provider." *Id.* at 12.  Thus, in a state that is generally deemed to have one of the toughest consumer fraud laws in the nation (and whose attorney general is not among *Amici*), the claim of inadequate price disclosures is not as straightforward as *Amici* seem to believe it is.[3]

Because the disclosure statements — plainly written and located in various documents that consumers review before service commences — adequately conveyed to the reasonable consumer the nature of the rates and all other necessary disclosures, Energy Plus believes that it would prevail at trial.  The Court need not "try the case," however, in order to see that the *Wise* class would have faced substantial risk had it decided to pursue the action and risk an adverse finding rather than settle.

It was in light of these facts about the disclosures — and the risks to class recovery that they present — that the pending settlement was crafted.  For class plaintiffs, "liability or

---

[3]     It is worthy of mention in this context that consumers in states whose attorneys general have not joined this attempt to undermine the settlement will, if *Amici* prevail, be deprived of the relief that they claimed in the settlement, without even the cold comfort of knowing that their state's attorney general believes he or she could obtain a few more dollars if he or she decided to sue.

damages at trial is far from certain." *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262

(RWS), 2002 U.S. Dist. LEXIS 22663, *57 (S.D.N.Y. Nov. 26, 2002). Yet *Amici* fail to

calculate for that uncertainty, or explain why that uncertainty does not justify the monetary relief

that the settlement provides. In view of the obvious benefits of the pending settlement and the

obvious risks of litigating the present action through trial, the monetary relief provided to class

plaintiffs under the proposed settlement is fair, reasonable and adequate.

*Amici*'s contention that the settlement should be rejected because Energy Plus induced

customers to believe that it would charge no more than the local utilities is counterfactual.

Energy Plus did not guarantee savings over the utilities' state-mandated, rate-regulated default

service, priced essentially at the utilities' wholesale cost.[4] By advertising that its rates were

based on the market and other factors, Energy Plus never contractually required itself to match

the utilities' default service rates. Moreover, there is no law or regulation so requiring. A jury

could easily conclude that a reasonable consumer in a state where competition among numerous

ESCOs is the norm would not understand the "market" — a term that has no meaning in a

monopolistic utility world — to be limited exclusively to the local former-monopoly's default

service rates. Rather, the more reasonable conclusion would be that the relevant "market" is the

one in which Energy Plus competes with other ESCOS. Thus, the NYAG's calculation of a

hypothetical New York customer's actual damages at about $440 by reference solely to utility

default service rates is unreasonable and proves nothing. *See Am.* Br. at 8. This understanding

---

[4]     For example, in New York, a customer's energy bill consists of two parts — supply
       (electric or natural gas) and delivery (poles and wires). By Order of the New York State
       Public Service Commission establishing retail energy competition (or "Retail Choice"),
       customers can purchase energy supply from either an ESCO or the local electric or gas
       distribution utility, which holds a monopoly on delivery service. Customers who do not
       choose an ESCO and continue to purchase supply from the distribution utility receive
       "default service." Electric default service pricing is essentially a cost-recovery pass-
       through rate, on which distribution utilities are not permitted to profit.

of the meaning of the word "market" was debated in negotiations with class counsel and it is reasonable to believe that the decision to settle reflects that debate.

As to the contention that it is difficult for consumers to get up-to-date comparison information about electric rates, if that is so, it is something for public utility commissions to fix, as *Amici* concede in footnote 8 of their brief. *Amici* make no allegation that Energy Plus failed to comply with regulations about price disclosure, nor could they. Moreover, as explained supra Part II.B.1, advertising of introductory rates is not only normal but well-accepted and even encouraged by the regulators.

Having ignored the existence of any downside risk for the class, *Amici* conclude that "the risk of litigation" does not justify the settlement where "[b]oth the Connecticut Attorney [*sic*] and New York Attorneys General have pending matters addressing similar false advertising and deceptive business practices by Defendant." *Am.* Br. at 10. But neither Connecticut nor New York has commenced any civil action, the resolution of any such action could be years away, and an outcome favorable to the Connecticut or New York Attorney General is far from certain. They would face many of the same challenges and risks of failure that class counsel evaluated in deciding whether to recommend a settlement in this case. *Amici* imply that Connecticut and New York can do better than the proposed settlement without offering any explanation of why that might be true. Surely more is required before rejecting a settlement negotiated in good faith by competent counsel and supported widely by class members. In short, *Amici* are asking this Court to require the class to let loose the bird in hand in exchange for the uncertain potential that the attorneys general might recover more—potentially quite far in the future—if they decide to litigate.

The parties have, after arm's length negotiations, devised fair and reasonable settlement terms, and their efforts should not be displaced by the mere potentiality of future litigation that may or may not end in a larger payout to the class members.  As Judge McMahon warned in *Charron v. Pinnacle Group*,  "the perfect could easily become the enemy of the good; that would not be in the best interests of the class as a whole."  874 F. Supp. 2d at 184-85.

2.      <u>Statutory Remedies of the Attorneys General Are Irrelevant Here</u>

*Amici* point to enforcement actions taken against others and the statutory remedies available to the states when they prevail in civil enforcement actions in the form of fines and penalties.  *Am.* Br. at 2-3.  *Amici* do not say how fines and penalties that may never be awarded could possibly factor into the analysis of the settlement recovery for these class members, who live in nine states, including five whose attorneys general have not joined *Amici*.

Rejection of the settlement in this case would leave more than 88,000 class members without a recovery that they are expecting, with no guarantee that a future class action settlement — much less a more desirable one — would be achieved.  This Court may not modify the parties' agreement to accommodate *Amici*.  Rule 23(e) requires court approval of class action settlements, but "does not authorize the court to require the parties to accept a settlement to which they have not agreed."  *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986); *see also, e.g., Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010) ("A district court is not a party to the settlement, nor may it modify the terms of a voluntary settlement agreement between parties.").

3.      <u>Certification and Continued Class Treatment Are Uncertain.</u>

Settlement is favored when taking into account the difficulty in certifying a class and the risks that inhere in maintaining a class action through trial.  *Wal-Mart*, 396 F.3d at 117.  Those difficulties are apparent in this case because, over the lengthy class period, there were many non-identical versions of the marketing materials, casting commonality and typicality in doubt.

11

Separate liability and damage issues arise due to different competitive climates in the many areas Energy Plus serves, meaning that customers in areas where rate disparities might not exist or might be insignificant would be ineligible as class members.  Energy Plus customers, who include residential and business consumers, did not all contract for the exact same services, even in the same geographic areas.

Differences in price over the 4+ years at issue also demonstrate that damages could likely not be assessed on a class-wide basis in a manner that would adequately identify damages that resulted from the allegedly deceptive advertising.  Moreover, the value of the rewards customers accumulated would necessarily factor into the damages analysis and it will differ from customer to customer.  Without a methodology to assess damages on a class-wide basis, common issues do not predominate and class treatment is unsustainable.  *See Comcast Corp. v. Behrend*, __ U.S. __, 133 S. Ct. 1426, 1433 (2013).  Some members of the class may have joined Energy Plus at a time and in a market where Energy Plus's rates were *lower even than the prevailing local utility rate*, assuming *arguendo* that the utility's supply rate is a relevant benchmark.  Because other ESCOs' rates — and therefore the market on average — would likely have exceeded Energy Plus's rates in the same period, some putative class members would have no damages at all.  The same sort of price differences also mean that, even if the disclosures in the marketing material were held to be flawed, some members of such a putative class will not have been deceived, because they received the savings that they would be contending were offered in the marketing material.

The path becomes even more difficult for plaintiffs when one factors in those persons who fully read and understood all the material they received and were well pleased with Energy

Plus's prices and service.  While these problems of class maintenance may not be considerations for the plaintiff-attorney general in his own cases, they are very real difficulties for this class.

    4.    <u>The Settlement is Reasonable in Light of the Class's Potential Damages.</u>

*Amici* also deride the settlement when compared to statutory and treble damages, which are available under some state laws.  *Am.* Br. at 8.  *Amici* fail to point to any class action settlement in which class members recovered 100% of their potential actual damages or statutory and trebled damages.  Defendants would have no incentive to settle if it meant paying out 100% of all possible damages.

*Amici* cite only a single case for the proposition that courts "closely scrutinize" class settlements that release treble damages claims.  *Am.* Br. at 8-9 (citing *Molski v. Gleich*, 318 F.3d 937, 950, 955 (9th Cir. 2003)[5]).  That citation is misleading.  In *Molski*, the district court certified a mandatory class under Rule 23(b)(2) with no opportunity to opt out.  The appeals court observed that "statutory treble damages *can be* substantial" and therefore "minimum due process requires the right to opt-out."  *Molski*, 318 F.3d at 950 (emphasis added).  The *Molski* court then observed that "[t]he due process concerns raised by the release of treble damages could have been addressed . . . [by] certif[ying] the class under Rule 23(b)(3)" or otherwise providing the class with the right to opt out.  *Id*. at 951, n.16.  This settlement involves a Rule 23(b)(3) class which had notice and the right to opt out.  In short, *Molski*'s discussion of treble damages provides no support for *Amici*'s contentions.

Moreover, enhanced damages often are awarded only upon a showing of willfulness or malice.  For example, under the Texas Deceptive Trade Practices Consumer Protection Act, in

---

[5]    Subsequently *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 617 (9th Cir. 2010), *in turn, rev'd on other grounds by Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541 (2011).

13

order for damages to be trebled, the trier of fact must find conduct that was committed "knowingly"— or that "objective manifestations indicate that a person acted with actual awareness." Tex. Bus. & Com. Code Ann. §§ 17.45(9), 17.50(b)(1). Similarly, under Massachusetts' consumer protection statute, double or treble damages depend upon a finding "that the use or employment of the [unfair or deceptive] act or practice was a willful or knowing" violation of the state's consumer protection law. Mass. G.L.c. 93A, § 9(3). *Amici* make no such showing and the evidence, such as the disclosure of the introductory nature of the initial rate and the subsequent variable rate, suggest exactly the opposite of willfulness. The settlement amount is also entirely reasonable in light of the fact that consumers were free to switch out of Energy Plus's variable rate service without a fee and at any time.[6]

Moreover, the logical conclusion concerning the many consumers who stayed with Energy Plus for long periods of time is that they were satisfied with the service, rewards, and price. This conclusion is borne out by a recent J.D. Power & Associates customer-satisfaction survey on retail electricity suppliers in which Illinois consumers ranked Energy Plus first overall. *Integrys last in J.D. Power power provider satisfaction survey*, Chicago Tribune, June 26, 2013, available at http://www.chicagotribune.com/business/breaking/chi-integrys-jd-power-20130626,0,2503143.story ("Philadelphia-based Energy Plus earned top place among the seven companies ranked in the survey, which included only companies for which J.D. Power received at least 100 responses.").

---

[6]     *Amici* contend that it takes two months or more to switch suppliers. Although plaintiffs alleged the same, which is perhaps the source of *Amici*'s contention, it is just not so. Attached is a chart showing the amount of time it typically takes each utility to perform a switch after receiving notice from Energy Plus, which it gives within 24 hours of the customer choosing to switch. *See* Exhibit B.

The settlement reflects the fact of consumer satisfaction by providing varying amounts over the length of service.  This result was carefully negotiated by counsel, with the aid of extensive, detailed spreadsheets containing length of service among other facts.  *Amici* present no evidence to undermine this carefully considered approach.

     5.    <u>The Settlement Amount is Reasonable in Light of Defendant's Resources.</u>

Among *Grinnell*'s fairness factors is the ability of the defendants to withstand a greater judgment if the case proceeded to trial and the class prevails.  *Grinnell*, 495 F.2d at 467. Companies of the size of Energy Plus Holdings LLC have their financial limits, and Class Counsel reasonably took that into account.  This factor too weighs in favor of approval of the settlement.

    C.    <u>The Scope of the Release is Ordinary and Appropriate.</u>

The Court should reject *Amici*'s argument that the release contained in the settlement agreement is overbroad.  The release is limited to claims that were made or could have been made in the complaint and that "relate to or arise out of the conduct" alleged in the complaint and similar conduct.  Such language is completely standard and appropriate in class action settlements.  *See, e.g., Wal-Mart*, 396 F.3d at 108 ("Class actions may release claims, even if not pled, when such claims arise out of the same factual predicate as settled class claims." (internal citations omitted)).  As the Second Circuit observed, "[p]ractically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability."  *Id.* at 106 (internal quotations and citation omitted).

The single example that *Amici* muster to support their "overbreadth" argument is a red herring.  *Amici* assert that the "release may be read to bar class members from challenging Defendant's imposition of their significant early termination fees when consumers cancel their fixed-rate contracts midterm."  *Am*. Br. at 15.  To begin with, customers with "fixed rate"

15

contracts could not allege that marketing materials failed to disclose the "variable" nature of the rates, so that by releasing that claim they are releasing nothing.  More importantly, in New York, where Energy Plus has had the longest experience with fixed rate contracts, it has never collected an early termination fee.

Amici also argue that the release is overbroad because it "implies" that "private parties" can "impede sovereign state entities from exercising their powers."  Am. Br. at 16.  If, as Amici go on to state:  "Private parties cannot abrogate the States' broad sovereign enforcement powers," this argument is another red herring.

Without citation to authority — and Energy Plus has found none — Amici ask the Court to reject the settlement because class members might mistakenly believe that the release does what Amici themselves say it only "implies," i.e., impose a limit on the "states' sovereign abilities to exercise their police and regulatory powers."  Id.  First, no class member has objected on this ground, so there is no evidence that this "mistaken impression" exists.  Even if it did, at least one court, in similar circumstances, expressed certitude that a settlement agreement would not foreclose state enforcement actions:  "The attorneys' general law enforcement powers are not claims the plaintiffs have, and as such, the plaintiffs do not release any of these claims."  In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig., 263 F.R.D. 226, 241 (E.D. Pa. 2009).

Even if Amici's fears were less doubtful, this would still be an odd request.  Amici seem to seek an advance ruling on the preclusive effect of a judgment to which their states are not parties (because they are not class members) on an issue that is not before this Court — solely because an unfavorable, future interpretation of what the release "implies" might adversely affect them in an entirely different suit that they have not brought and may never bring.  See Larson v.

16

*Sprint Nextel Corp.*, No. 07-5325 (JLL), 2010 WL 234934, at *16 (D.N.J. Jan. 15, 2010)

(rejecting state's request "to declare that the release provision . . . does not affect its right to

pursue its law enforcement action").  Thus, not only is there no basis in the release language

upon which to upend the settlement, there is no basis for this Court to opine on the preclusive

effect of a release.  *See Pelt v. Utah*, 539 F.3d 1271, 1285 (10th Cir. 2008) ("It is well settled that

a court adjudicating a class action cannot predetermine the res judicata effect of its own

judgment.").

> D.      *Amici*'s Speculation About the Claims Process Should be Disregarded.

*Amici* argue that the claim options are confusing and that the claim forms are

unnecessary.  *Am.* Br. at 11-13.  Again without evidence of any kind, *Amici* contend that the

claims process "is likely to cause considerable confusion among customers, resulting in a

substantial reduction in the number of claims ultimately filed." *Id.*

Contrary to *Amici*'s assertions, the claim options, while varied, are simply worded and

easily understood.  Moreover, the settlement administrator provided an Interactive Voice

Response system and live operators to answer class members' questions about the claims

process.  Decl. of Philip Cooper ¶ 7.  As of the date of the settlement administrator's affidavit of

service, 88,618 class members had filed, and the deadline for submitting claims was still a month

away — July 24, 2013.  *Id.* ¶ 17.  More than 29,700 calls have been received by the IVR system.

*Id.* ¶ 14.  In other words, class members are using the claims process successfully,

notwithstanding the unsupported concerns of *Amici,* who may have less familiarity with the

claims website than do the class members.

Tellingly, the record does not reveal a single objection from any class member based

upon the complexity of the claim form, problems with the IVR system, or the fact that multiple

options were available.  Similarly, none of the opt outs even suggests that the reason for his or

her request for exclusion is based on misunderstanding the claim options or the process for making a claim.  The robust response rate from class members also belies *Amici*'s speculation that confusion would result in a "substantial reduction" in claims.  Rather, it demonstrates that the settlement terms were well received.

The mere fact that a claimant must file a form to receive payment does not render a settlement unfair or inadequate.  "[T]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment."  *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011) (citing *Milliron v. T-Mobile USA, Inc.*, No. 08-4149 (JLL), 2009 U.S. Dist. LEXIS 101201, *19 (D.N.J. Sep. 10, 2009), *aff'd*, 423 Fed. Appx. 131 (3d Cir. 2011)); *see also Lemus v. H&R Block Enters. LLC*, No. C 09-3179 SI, 2012 U.S. Dist. LEXIS 119026, *16-17 (N.D. Cal. Aug. 22, 2012) (finding settlement "fair, adequate and reasonable" despite objection that "there is no need for class members to file claims").  Courts recognize that it is appropriate to take into account that a claims process is a negotiated facet of a settlement.  *Schulte* at 593-94; *see also Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 200-01 (D.D.C. 2011).

*Amici* contend that a claims-made settlement is unnecessary because Energy Plus could "simply issue bill credits to its current customers."  *Am.* Br. at 13.  Like so many other contentions in *Amici*'s brief, this one is unsupported by facts.  There are relatively few service areas in which ESCOs like Energy Plus can issue credits, and in the vast majority of service locations, they cannot do so because the local utilities perform the billing services.  Accordingly, because a class-wide settlement must have a uniform claims process, the claims process used here was necessary and appropriate for the entire class.

18

It is perhaps needless to say, but nevertheless telling, that this fact about the billing processes that ESCOs must follow is not found in *Amici*'s brief.  It is a fact that was considered in the settlement negotiations and taken into account in structuring the claims process.[7]

Perhaps the most egregious of *Amici*'s mistaken assumptions is the wholly unsupported accusation that Energy Plus benefits financially by class members' choosing the gift certificate option.  *Am.* Br. at 9 ("Defendant benefits through its compensation arrangements with its partner merchants. The partner merchants pay Defendant to steer customers towards these merchants.").  To the contrary, Energy Plus will pay full face value for the gift certificates going to class members who choose this option, which are to be provided by a third party with which Energy Plus has no relationship.  Energy Plus will receive no payments or compensation in any form from partner merchants with respect to these gift cards.  These facts could have been determined by the *Amici* without even picking up the phone.  If *Amici* had visited the website of the settlement administrator, they would have seen Frequently Asked Question number 3, entitled "What can I get from the proposed settlement?,"  which contains a link to "more information about the various options" describing the gift certificate option as follows:

> If you choose this option, you will receive a gift certificate in the mail with a value equal to your cash award amount, rounded up to the nearest $5.00. For example, if your settlement amount is $16.00, you will receive a gift certificate for $20.00. That gift certificate will be redeemable at www.giftcertificates.com , where you can choose from a list of various merchant gift cards. To view a list of participating merchants, click here.[8] Not all merchant gift

---

[7]    In point of fact, the NYAG, after announcing his intention to file this brief, refused an offer to meet with Energy Plus ahead of his filing to discuss the NYAG's concerns about the class action settlement.  Indeed, Energy Plus and its counsel had multiple calls and met with the NYAG after he was sent notice under CAFA of this settlement, on March 18, 2013.  Yet the NYAG never raised the concerns that he now says merit rejection of the settlement.

[8] http://www.energysettlement.com/Documents/EPS0001/Standard%20Merchant%20List.pdf

> cards are available in all denominations. Should you choose a gift
> card that has a minimum amount that is higher than your award
> amount, you will have to pay an additional amount to obtain that
> particular gift card. You can view a list of small denomination gift
> cards available by clicking here.[9] Participating merchants are
> subject to change without further notice.

Had Amici explored the settlement administrator's website, they would have seen that the

gift certificate option is being administered by a third party.  Had they asked, they would have

received assurance that the third party has no ties to Energy Plus.

> E.      The Injunctive Relief Provisions Adequately Address Class Members' Claims

*Amici* criticize the settlement on the ground that the injunctive relief provided in the

settlement does not:  1) prohibit introductory rates; 2) prohibit fixed rate offers that "do not

reveal clearly and conspicuously that $100 penalties apply" to early terminations; 3) enjoin

"deceptive business practices generally," and 4) extend past July 31, 2014.

The sole case that *Amici* point to in support of their attack on the injunctive relief

provided to the class is *Norman v. R.L. McKee*, a 1970 Ninth Circuit case affirming a district

court's rejection of a settlement involving brokerage fees because "only future investors would

benefit [from a change in fee schedules] . . . and not the present investors who sought recovery of

excess management fees."  431 F. 2d 769, 771-72 (9th Cir. 1970).  Before the settlement in *R.L.

McKee* was even presented to the district court, the SEC reached a settlement in its own action

pursuant to which the defendants agreed to refund fees "and to begin performing brokerage

services at cost for an indefinite time."  *Id.* at 772.  The Ninth Circuit affirmed the district court's

ruling that the injunctive portion of the settlement "did not benefit the Fund or its investors since

[defendant] had only offered to do for ten years what the SEC had already ordered it to do

indefinitely."  *Id.*

---

[9] http://www.energysettlement.com/Documents/EPS0001/MerchantList_Under$15.pdf

Almost precisely the opposite situation exists here.  This settlement does not compel that which was already mandated elsewhere.  There are no other settlements and no other orders or consent decrees on the subject.  Also unlike settlement in *R.L. McKee*, the class here is receiving real financial benefit that is in no manner lessened by the injunctive relief.

*Amici*'s criticism of the injunctive relief in the settlement is, like the brief as a whole, based on an assumption of liability and unrealistic assumptions about the relief that could be obtained if the class were to prevail at trial.

### 1.   The Law Does Not Prohibit Introductory Rates

*Amici* urge that the injunctive relief ought to bar Energy Plus from "continuing to deceptively advertise below-market teaser rates."  *Am*. Br. at 13.  As set forth above in discussing Amici's challenge to so-called "teaser" rates, *supra* Part II.B.1, such introductory rates are commonplace and states, including New York, Illinois and Connecticut, recognize their use in this industry.  Any injunction that would prohibit Energy Plus from using introductory rates in the future would go beyond the law as it stands and place Energy Plus at a competitive disadvantage vis-à-vis other ESCOs.

### 2.   An Injunction Prohibiting Early Termination Fees is not Warranted.

Similarly, *Amici* contend that the settlement should enjoin Energy Plus from "promoting fixed-rate offers that do not reveal clearly and conspicuously that $100 penalties apply if the customer chooses to cancel the contract before it expires."  *Am*. Br. at 14.  Energy Plus's fixed rate offers did, in fact, reveal that a $100 early termination fee may apply to those who terminate a fixed rate plan before the contract term expires, when the contract contained such a fee.  Not only were there no allegations in these cases regarding early termination fees, Energy Plus's fixed rate contracts in use in New York no longer contain any early termination fees.  Moreover, as with introductory rates, such fees are legal and their use widespread.  *Amici* make no argument

21

supporting an injunction placing Energy Plus at a competitive disadvantage in this regard any more than they do with respect to introductory rate.  And moreover, as noted above, an early termination fee has never been collected by Energy Plus in New York.

3. The Court Cannot Enjoin "deceptive business practices generally."

Amici disparage the settlement agreement because the injunctive relief does not "enjoin Defendant from engaging in false advertising or deceptive business practices generally."  *Am*. Br. at 14.  There is never a reason to enter an injunction or consent decree that merely requires a person to do what he is already obliged to do.  Rule 65 requires every injunction to "describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required."  Fed. R. Civ. P. 65 (d)(1)(C); *see also Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996).  Because injunctions carry possible contempt sanctions for their violation, this was the law even before there were Federal Rules of Civil Procedure.  *See Swift & Co. v. United States*, 196 U.S. 375, 401 (1905)(Holmes, J) (striking wording amounting to a "sweeping injunction to obey the law" as it fails to inform defendants "as accurately as the case permits what they are forbidden to do").  Accordingly, the fact that the injunctive relief included in the settlement is limited to "a few specific false advertising claims" (*see Am*. Br. at 6, 13), rather than being a cause for complaint, is exactly as it should be.  The injunctive relief is narrowly tailored to the claims at issue.

4. The July 31, 2014 End Date for Injunctive Relief is Appropriate.

The plaintiff class includes current and former customers as of October 15, 2012.  Two years of prospective restrictions on certain advertising statements are more than adequate relief for this class, bearing in mind that almost everyone who may have received or read Energy Plus's marketing materials after July 2014 will not be a member of the class.  While Energy Plus has no intention to use any of the claims that the settlement agreement restricts in the future —

22

even several years in the future — it also understandably has no desire to remain under an injunction for an indefinite period.

Importantly, moreover, the injunctive relief provided in this settlement — to which Amici are not parties — presumably does not prohibit an attorney general from seeking different injunctive relief or, in the NYAG's case, awaiting final rulemaking by the New York Public Service Commission, to which he alludes. *Am.* Br. at 6, n.8. The question this Court faces is whether *this* settlement is fair to *this* class, not whether non-members of the class might have preferred different injunctive relief.[10]

Put another way, the sunset provision respecting prospective injunctive relief does not render the settlement as a whole unfair. While plaintiffs sought both monetary and injunctive relief in their complaints, they never sought an injunction requiring Energy Plus to abandon introductory rates. Nor would any such injunction be appropriate, in light of their wide acceptance, as shown above. Thus, *Amici*'s "objection" goes well beyond the scope of the complaints in these cases. The role of the Court in approving or disapproving a settlement does not allow it to provide relief for some other hypothetical case. *Cf. United States v. Microsoft*, 56 F.3d 1448, 1459-60 (D.C. Cir. 1995) (court cannot "reformulat[e] the issues" or "redraft the complaint"). Keeping the focus where it belongs, on the complaints that this proposed settlement addresses, it is not at all clear that the Court could have granted the broad injunctive relief that

---

[10]   It is equally irrelevant, therefore, that the NYAG "has taken enforcement actions against numerous [other] ESCOs" seeking injunctive relief. *Am.* Br. at 2 and n.3. It is highly relevant, however, that the cases the NYAG cites do not recite "similar deceptive marketing practices to those alleged" by plaintiffs. *Id.* The cited cases largely concern "unauthorized switching of providers," which has not been and could not be alleged against Energy Plus. Similarly, none of the class actions that will be settled as a result of final approval in this case alleges "impersonating utility employees." *See id.*

the *Amici* now contend is merely "fair" and "adequate," even if plaintiffs had prevailed on all of their claims at trial.

Moreover, the far-reaching injunction that *Amici* seem to have in mind would almost certainly violate Rule 65(d).  Certainly the Court has wide discretion in framing injunctions, but such relief must be narrowly tailored and may not, as *Amici* urge, simply "enjoin 'all possible breaches of the law.'"  *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 30 (2d Cir. 1978) (quoting *Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945)).  The Court has before it a settlement, not the result of a trial in which liability was assessed.  It would be absurd to require all settling defendants to effectively admit wrongdoing by agreeing to an injunction that presumes a resumption of the conduct that gave rise to the suit.  No defendant would settle under those circumstances.

One of the central purposes of a settlement is to avoid the necessity of having the court and jury resolve disputed issues of fact and law, as well as the propriety and extent of injunctive relief.  Accordingly, while the Court must engage in a rigorous review of the settlement, "[i]t cannot be overemphasized that neither [this C]ourt in approving the settlement nor [the appellate courts] in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."  *Grinnell*, 495 F. 2d at 456.

F.     Attorneys' Fees Are Within the Discretion of the Court and Do Not Bar Approval.

The Settlement Agreement provides that the Court must approve an award of fees.  Class counsel's fee petition had yet to be filed when *Amici* filed their brief, so it is easy to see why no detailed support yet existed for the fees.  Importantly, neither the fee amount, whatever the Court decides it should be, nor the costs of administration of the settlement will lessen the amount available to pay class members.

Moreover, the fee amount stated in the settlement agreement is merely a ceiling. So-called "ceiling" or "clear-sailing" provisions, in which defendants agree to a maximum dollar amount for an unopposed fee petition, do not provide grounds for upsetting a settlement like this one in which the parties carefully negotiated the types and amounts of relief going to the class before ever turning to the question of fees. *Cf. Malchman v. Davis*, 761 F.2d 893, 905 & n.5 (2d Cir. 1985) ("agreement 'not to oppose' an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged"), *abrogated on other grounds*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

## III.    Conclusion

For all the foregoing reasons, *Amici*'s objections to the settlement should be rejected and the settlement should be given final approval so that relief for which the class members have applied may be distributed.

 /s/ Dana B. Klinges
Dana B. Klinges
dklinges@duanemorris.com
Charles M. Hart (*pro hac vice*)
chart@duanemorris.com
DUANE MORRIS LLP
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1000
Facsimile: 212.692.1020

*Attorneys for Energy Plus Holdings LLC and
Energy Plus Natural Gas LLC*

DM1\3953989.3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGELA WISE and GIDEON ROMM, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>ENERGY PLUS HOLDINGS LLC,<br><br>        Defendant. | Civil Action No. 11-7345 |

## CERTIFICATE OF SERVICE

I, Charles M. Hart, hereby certify that on July 1, 2013, I caused a true and correct copy of the

Brief of Energy Plus Holdings LLC in Response to the Brief *Amicus Curiae* of the Attorneys General to

be served upon Class Counsel by ECF and by e-mail and U.S. Mail upon the following:

Eric T. Schneiderman
Attorney General of the State of New York
c/o Keith H. Gordon, Esq.
120 Broadway, 3rd Floor
New York, NY 10271

George Jepsen
Attorney General for the State of Connecticut
c/o John Wright, Esq.
55 Elm Street
Hartford CT 06106

Lisa Madigan
Attorney General for the State of Illinois
c/o Jane Notz, Esq.
100 West Randolph Street, 12th Floor
Chicago, IL 60601

Douglas F. Gansler
Attorney General for the State of Maryland
c/o Philip Ziperman, Esq.
200 St. Paul Place
Baltimore, MD 21202

                /s/ Charles M. Hart
                Charles M. Hart